**Frank A. PRINCIPE, Ann Principe and Frankie, Inc., Appellants,**

v.

**McDONALD'S CORPORATION, McDonald's System, Inc., and Franchise Realty Interstate Corporation, Appellees.**

No. 79–1702.

United States Court of Appeals, Fourth Circuit.

Submitted June 3, 1980.

Decided Sept. 26, 1980.

Before WINTER, Circuit Judge, HARRY PHILLIPS, Senior United States Circuit Judge, Sixth Circuit, sitting by designation, and J. DICKSON PHILLIPS, Circuit Judge.

HARRY PHILLIPS, Senior Circuit Judge.

This appeal presents the question of whether a fast food franchisor that requires its licensees to operate their franchises in premises leased from the franchisor is guilty of an illegal tying arrangement in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.[1] On the facts of this case, we hold it does not and affirm the directed verdict for the defendants.

I

The appellants, Frank A. Principe, Ann Principe and Frankie, Inc., a family owned corporation, are franchisees of McDonald's System, Inc. The Principes acquired their first franchise, a McDonald's hamburger restaurant in Hopewell, Virginia, in 1970. At that time, they executed a twenty year franchise license agreement and a store lease of like duration. In consideration for their rights under these agreements, the Principes paid a $10,000 license fee and a $15,000 security deposit, and agreed to remit 2.2 per cent of their gross receipts as royalties under the franchise agreement and 8.0 per cent as rent under the lease.[2] In 1974, Frank Principe and his son, Raymond, acquired a second franchise in Colonial Heights, Virginia, on similar terms. The Colonial Heights franchise subsequently was transferred to Frankie, Inc., a corporation owned jointly by Frank and Raymond Principe.

The Principes sought to purchase a third franchise in 1976 in Petersburg, Virginia. Robert Beavers, McDonald's regional manager, concluded the plaintiffs lacked sufficient management depth and capabilities to take on a third store without impairing the quality of their existing operations. During the next twenty months, the Principes obtained corporate review and reconsideration of the decision to deny them the franchise. They were notified in May 1978 that the Petersburg franchise was being offered to a new franchisee.

They filed this action a few days later alleging violations of federal and state antitrust and securities laws and state franchising laws. Counts I and II alleged McDonald's violated federal antitrust laws by tying store leases and $15,000 security deposit notes to the franchise rights at the Hopewell and Colonial Heights stores. Count XII alleged McDonald's denied the Principes a third franchise in retaliation for their refusal to follow McDonald's pricing guidelines. The remaining counts, alleging violations of state and federal antitrust and securities laws, as well as Virginia franchising laws, were dismissed prior to trial and are not before us on this appeal.

Following discovery the district court granted summary judgment for McDonald's on the security deposit note tie in claims. District Judge D. Dortch Warriner found the notes represented deposits against loss and do not constitute a product separate from the store leases to which they pertain.

The court directed a verdict for McDonald's on the store lease tie in counts at the close of all the evidence. Relying on the decision of this court in *Phillips v. Crown Central Petroleum Corp.*, 602 F.2d 616 (4th Cir.), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1021, 62 L.Ed.2d 756 (1980), Judge Warriner held the Principes had failed to introduce any evidence of McDonald's pow-

---

**1.** The complaint also alleged that the mandatory franchise lease combination violates § 3 of the Clayton Act, 15 U.S.C. § 14. The directed verdict for the defendants made it unnecessary for the district court to differentiate between the Sherman Act and Clayton Act tying claims. We note, however, that § 3 of the Clayton Act is limited to restraints involving "goods, wares, merchandise, machinery, supplies or other commodities." Because neither the tying (franchise) nor the tied (lease and security deposit) product fits this definition, the defendants were entitled to summary judgment on the Clayton

Act tying claims. *See Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1214 (9th Cir. 1977). *Cf. Advance Business and Supply Co. v. SCM Corp.*, 415 F.2d 55, 65–66, *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970). Section 3 does not apply where the tied product is a service contract.

**2.** Since 1970 McDonald's has increased the franchise fee to $12,500, the franchise royalty to three per cent and the rent payment to 8.5 per cent.

er in the tying product market, which he held is the food retailing market. The court held, however, McDonald's sells only one product: the license contract and store lease are component parts of the overall package McDonald's offers its prospective franchisees. Accordingly, Judge Warriner held as a matter of law there was no illegal tie in.

The remaining issue, whether McDonald's denied the Principes a third franchise in retaliation for their pricing independence, went to the jury which held for the defendants. The jury returned an unsolicited note stating they felt the Principes had been wronged, although price fixing was not the reason, and should be awarded the Petersburg franchise. The court disregarded the jury's note and entered judgment on the verdict for McDonald's.

The Principes appeal from the summary judgment for McDonald's on the security deposit tying claim, the directed verdict on the lease tying claim, various evidentiary rulings and the refusal of the district court to order a new trial. We affirm.

## II

At the time this suit was filed, McDonald's consisted of at least four separate corporate entities. McDonald's Systems, Inc. controlled franchise rights and licensed franchisees to sell hamburgers under the McDonald's name.[3] Franchise Realty Interstate Corporation (Franchise Realty) acquires real estate, either by purchase or long term lease, builds McDonald's hamburger restaurants, and leases them[4] either to franchisees or to a third corporation, McOpCo. McOpCo, which is not a party to this suit, operates about one-fourth of the McDonald's restaurants in the United States as company stores. Straddling this triad is McDonald's Corporation, the parent, who owns all the stock of the other defendants. Because the various defendants have substantially similar corporate hierarchies and operate in conjunction under the direction and control of the corporate parent, we shall refer to them collectively as McDonald's unless the context requires otherwise.

McDonald's is not primarily a fast food retailer. While it does operate over a thousand stores itself, the vast majority of the stores in its system are operated by franchisees. Nor does McDonald's sell equipment or supplies to its licensees. Instead its primary business is developing and collecting royalties from limited menu fast food restaurants operated by independent business people.

McDonald's develops new restaurants according to master plans that originate at the regional level and must be approved by upper management. Regional administrative staffs meet at least annually to consider new areas into which McDonald's can expand. Once the decision is made to expand into a particular geographic area, specialists begin to search for appropriate restaurant sites.

McDonald's uses demographic data generated by the most recent census and its own research in evaluating potential sites. McDonald's attempts to analyze and predict demographic trends in the geographic area. This process serves a two fold purpose: (1) by analyzing the demographic profile of a given market area, McDonald's hopes to determine whether the residents are likely to buy fast food in sufficient quantities to justify locating a restaurant there; (2) by anticipating future growth, McDonald's seeks to plan its expansion to maximize the number of viable McDonald's restaurants within a given geographic area. Based on a comparison of data for various available sites, the regional staffs select what they believe is the best site in each geographic area. Occasionally no available site suits McDonald's requirements and expansion must be postponed.

---

3. McDonald's System, Inc. subsequently was merged into McDonald's Corporation, the parent, and no longer exists as a separate entity.

4. The McDonald's system of restaurants included some 4465 stores in 1978, 99 per cent of which were owned by Franchise Realty. See *Martino v. McDonald's System, Inc.*, 81 F.R.D. 81, 84 (N.D.Ill.1979).

The regional staffs compile master plans for expansion once particular sites are selected. These generally extend three years into the future and are broken down by site and month. Each proposed new restaurant is assigned projected dates for acquisition of the land, ground breaking and opening. These dates vary from location to location because of differences in restaurant size, zoning and special permit requirements and various other factors. The completed master plans must be approved first by regional management and later by corporate management.

As part of the planning process, McDonald's decides what type of store to build on each site and where to locate it on the land. Differences in lot size and shape necessitate adjustments in store and parking lot configurations. Projected market size dictates dining room size. Land elevation, sign restrictions, store visibility and local set back requirements control restaurant placement.

After the specifics of each proposed new restaurant are approved, McDonald's decides whether the store will be company operated or franchised. If the decision is to franchise the store McDonald's begins the process of locating a franchisee. This involves offering the store either to an existing franchisee or to an applicant on the franchise waiting list. Applicants need not live near the store in order to be offered the franchise, and they need not accept the first franchise they are offered. The Principes lived in Kenosha, Wisconsin, and rejected eleven separate McDonald's restaurants before accepting their first franchise in Hopewell, Virginia. McDonald's often does not know who will operate a franchised store until it is nearly completed because a new restaurant may be offered to and rejected by several different applicants.

Meanwhile, Franchise Realty acquires the land, either by purchase or long term lease and constructs the store. Acquisition and development costs averaged over $450,000 per store in 1978. All McDonald's restaurants bear the same distinctive features with a few exceptions due to architectural restrictions: the golden arches motif, the brick and glass construction and the distinctive roofline. According to the defendants, these features identify the stores as a McDonald's even where zoning restrictions preclude other advertising or signs.

As constructed, McDonald's restaurants are finished shells; they contain no kitchen or dining room equipment. Furnishing store equipment is the responsibility of the operator, whether a franchisee or McOpCo. McDonald's does provide specifications such equipment must meet, but does not sell the equipment itself.

Having acquired the land, begun construction of the store and selected an operator, McDonald's enters into two contracts with the franchisee.[5] Under the first, the franchise agreement, McDonald's grants the franchisee the rights to use McDonald's food preparation system and to sell food products under the McDonald's name. The franchise pays a $12,500 franchise fee and agrees to remit three per cent of his gross sales as a royalty in return. Under the

5. According to McDonald's, the two contract procedure is the product of the original agreement between Ray A. Kroc, the founder of McDonald's Corporation, and Richard and Maurice McDonald, who conceived the McDonald's speedy service system and licensed it to Mr. Kroc. His original agreement with the McDonald brothers prohibited Mr. Kroc from making any unilateral changes in the text of the McDonald's trademark licensing agreement under which he was issuing franchises. That licensing agreement provided McDonald's Corporation would collect 1.9 per cent of franchisees' gross sales and pay the McDonald brothers 0.5 per cent of gross sales as a trademark royalty. When McDonald's Corporation began to develop restaurants and offer them as part of the franchise package, it had to use separate franchise and lease agreements. Although the restriction on changing the terms of the franchise agreement was removed when the corporation bought the McDonald brothers' remaining interest in 1961, separate franchise and lease agreements were used until 1976 when they were integrated into a single document. Because Hopewell, Colonial Heights and most of the other McDonald's stores franchised before 1976 are still operated under interdependent franchise and lease agreements, we shall disregard McDonald's current practice for purposes of this appeal.

second contract, the lease, McDonald's grants the franchisee the right to use the particular store premises to which his franchise pertains. In return, the franchisee pays a $15,000 refundable security deposit (as evidence of which he receives a twenty year non–negotiable non–interest bearing note) and agrees to pay eight and one half per cent of his gross sales as rent. These payments under the franchise and lease agreements are McDonald's only sources of income from its franchised restaurants. The franchisee also assumes responsibility under the lease for building maintenance, improvements, property taxes and other costs associated with the premises. Both the franchise agreement and the lease generally have twenty year durations, both provide that termination of one terminates the other, and neither is available separately.

### III

The Principes argue McDonald's is selling not one but three distinct products, the franchise, the lease and the security deposit note. The alleged antitrust violation stems from the fact that a prospective franchisee must buy all three in order to obtain the franchise.

As evidence that this is an illegal tying arrangement, the Principes point to the unfavorable terms on which franchisees are required to lease their stores. Not only are franchisees denied the opportunity to build equity and depreciate their property, but they must maintain the building, pay for improvements and taxes, and remit 8.5 per cent of their gross sales as rents. In 1978 the gross sales of the Hopewell store generated about $52,000 in rent. That figure nearly equalled Franchise Realty's original cost for the site and corresponds to more than a fourth of the original cost of the entire Hopewell restaurant complex. At that rate of return, the Principes argue, Franchise Realty will have recouped its entire investment in four years and the remainder of the lease payments will be pure profit. The Principes contend that the fact the store rents are so high proves that

McDonald's cannot sell the leaseholds on their own merits.

Nor has McDonald'a shown any need to forbid its licensees to own their own stores, the Principes say. Appellants contend that McDonald's is the only fast food franchisor that requires its licensees not only to pay royalties but to lease their stores from the franchisor. *But see Krehl v. Baskin–Robbins Ice Cream Co.*, 78 F.R.D. 108 (C.D.Cal. 1978). Before 1959 McDonald's itself permitted franchisees to own their own stores. McDonald's could maintain its desired level of uniformity by requiring franchisees to locate and construct stores according to company specifications. The Company could even provide planning and design assistance as it apparently does in connection with food purchasing and restaurant management. The Principes argue McDonald's has not shown that the success of its business or the integrity of its trademarks depends on company ownership of all store premises.

A separate tied product is the note that evidences the lessee's $15,000 security deposit, according to the appellants. The Principes argue the security deposit really is a mandatory contribution to McDonald's working capital, not security against damage to the store or breach of the lease contract. By tying the purchase of these $15,000 twenty year non–negotiable non–interest bearing notes to that of the franchise, McDonald's allegedly has generated a capital fund that totalled over $45 million in 1978. It is argued that no one would purchase such notes on their own merits. The Principes assert that only by requiring franchisees to purchase the notes as a condition of obtaining a franchise has McDonald's been able to sell them at all.

McDonald's responds that it is not in the business of licensing use of its name, improving real estate for lease or selling long term notes. Its only business is developing a system of hamburger restaurants and collecting royalties from their sales. The allegedly tied products are but parts of the overall bundle of franchise benefits and obligations. According to McDonald's, the ap-

pellants are asking the court to invalidate the way McDonald's does business and to require it to adopt the licensing procedures of its less successful competitors. Federal antitrust laws do not compel such a result, McDonald's contends.

## IV

"There is, at the outset of every tie–in case, including the familiar cases involving physical goods, the problem of determining whether two separate products are in fact involved." *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 507, 89 S.Ct. 1252, 1260, 22 L.Ed.2d 495 (1969) (*Fortner I*). Because we agree with McDonald's that the lease, note and license are not separate products but component parts of the overall franchise package, we hold on the facts of this case there was no illegal tie in. Accordingly, *we affirm the summary judgment and directed verdict for Mc-Donald's on the tying claims.*

As support for their position, the Principes rely primarily on the decision of the Ninth Circuit in *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), one of the first cases to address the problem of franchise tie-ins. Chicken Delight was what McDonald's characterizes as a "rent a name" franchisor: it licensed franchisees to sell chicken under the Chicken Delight name but did not own store premises or fixtures. The company did not even charge franchise fees or royalties. Instead, it required its franchisees to purchase a specified number of cookers and fryers and to purchase certain packaging supplies and mixes exclusively from Chicken Delight. These supplies were priced higher than comparable goods of competing sellers. 448 F.2d at 46–47. A class composed of franchisees challenged the tying arrangement as a violation of the Sherman Act. The district court held for the franchisees and Chicken Delight appealed.

In addressing Chicken Delight's argument that the allegedly tied products all were essential components of the franchise system, the Ninth Circuit looked to the "function of the aggregation." 448 F.2d at 48. Viewing the essence of a Chicken Delight franchise as the franchisor's trademark, the court sought to determine whether requiring franchisees to purchase common supplies from Chicken Delight was necessary to ensure that their operations lived up to the quality standards the trademark represented. Judged by this standard, the aggregation was found to consist of separate products:

> This being so, it is apparent that the goodwill of the Chicken Delight trademark does not attach to the multitude of separate articles used in the operation of the licensed system or in the production of its end product. It is not what is used, but how it is used and what results that have given the system and its end product their entitlement to trademark protection. It is to the system and the end product that the public looks with the confidence that established goodwill has created. 448 F.2d at 49.

In the court's view, Chicken Delight had attempted "to extend trade-mark protection to common articles (which the public does not and has no reason to connect with the trade–mark)", *Id.*, a classic kind of illegal tying arrangement. *Cf. United States v. Paramount Pictures*, 334 U.S. 131, 158, 68 S.Ct. 915, 929, 92 L.Ed. 1260 (1948).

The Principes urge this court to apply the *Chicken Delight* reasoning to invalidate the McDonald's franchise lease note aggregation. They urge that McDonald's can protect the integrity of its trademarks by specifying how its franchisees shall operate, where they may locate their restaurants and what types of buildings they may erect. Customers do not and have no reason to connect the building's owner with the McDonald's operation conducted therein. Since company ownership of store premises is not an essential element of the trademark's goodwill, the Principes argue, the franchise, lease and note are separable

products tied together in violation of the antitrust laws.[6]

In *Phillips v. Crown Central Petroleum Corporation, supra,* 602 F.2d at 627, this court spoke of the "emerging law of tie ins in franchise settings". We noted that "the very essence of a franchise is the purchase of several related products in a single competitively attractive package." *Id.* àt 628, see also *Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211, 1224 (3d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). Franchising has come a long way since the decision in *Chicken Delight.*

Without disagreeing with the result in *Chicken Delight,* we conclude that the court's emphasis in that case upon the trademark as the essence of a franchise is too restrictive. Far from merely licensing franchisees to sell products under its trade name, a modern franchisor such as McDonald's offers its franchisees a complete method of doing business. It takes people from all walks of life, sends them to its management school, and teaches them a variety of skills ranging from hamburger grilling to financial planning. It installs them in stores whose market has been researched and whose location has been selected by experts to maximize sales potential. It inspects every facet of every store several times a year and consults with each franchisee about his operations's strengths and weaknesses. Its regime pervades all facets of the business, from the design of the menu board to the amount of catsup on the hamburgers, nothing is left to chance. This pervasive franchisor supervision and control benefits the franchisee in turn. His business is identified with a network of stores whose very uniformity and predictability attracts customers. In short, the modern franchisee pays not only for the right to use a trademark but for the right to become a part of a system whose business methods virtually guarantee his success. It is often unrealistic to view a franchise agreement as little more than a trademark license.

Given the realities of modern franchising, we think the proper inquiry is not whether the allegedly tied products are associated in the public mind with the franchisor's trademark, but whether they are integral components of the business method being franchised. Where the challenged aggregation is an essential ingredient of the franchised system's formula for success, there is but a single product and no tie in exists as a matter of law.

Applying this standard to the present case, we hold the lease is not separable from the McDonald's franchise to which it pertains. McDonald's practice of developing a system of company owned restaurants operated by franchisees has substantial advan-

---

**6.** Such a result would not be entirely unprecedented. In *Photovest Corporation v. Fotomat Corporation,* 606 F.2d 704, 724–725 (9th Cir. 1979), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980), the Seventh Circuit held Fotomat's practice of requiring its franchisees to lease kiosks from the franchisor is an illegal tying arrangement. In *Northern v. McGraw-Edison Company,* 542 F.2d 1336 (8th Cir. 1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977), the Eighth Circuit found a tying violation where a franchisor licensed its trademarks to dealer agents who, in turn, assembled complete dry cleaning operations and leased them as "going businesses" to franchisees. Similarly, in *Carpa, Inc. v. Ward Foods, Inc.,* 536 F.2d 39 (5th Cir. 1976), the court found an illegal tie in where a seafood restaurant franchisee was required to lease a completed restaurant from his franchisor.

However, none of these decisions dealt in any detail with the issue before this court: whether a franchise package granting the right to conduct a business in a specific company owned store can be separated into tying and tied products. Both *Northern* and *Capra, Inc.* were concerned primarily with equipment and supplies tie ins; store leases were only the vehicles by which the illegally tied packages were conveyed. While *Photovest* is closer to the present case, it is distinguished by the fact that Fotomat merely leased space in shopping center parking lots, installed prefabricated kiosks, and subleased to franchisees. There was no argument that Fotomat had greater expertise than its franchisees, conducted elaborate market research, or invested substantial sums of money. The Seventh Circuit did not elaborate its reasons for finding the franchise and lease separable. Because none of these cases dealt with the two product question in depth, we do not find them controlling as precedents.

tages, both for the company and for franchisees. It is part of what makes a McDonald's franchise uniquely attractive to franchisees.

First, because it approaches the problem of restaurant site selection systematically, McDonald's is able to obtain better sites than franchisees could select. Armed with its demographic information, guided by its staff of experts and unencumbered by preferences of individual franchisees, McDonald's can wield its economic might to acquire sites where new restaurants will prosper without undercutting existing franchisees' business or limiting future expansion. Individual franchisees are unlikely to possess analytical expertise, undertake elaborate market research or approach the problem of site selection from an area wide point of view.[7] Individual franchisees benefit from the McDonald's approach because their stores are located in areas McDonald's has determined will produce substantial fast food business and on sites where that business is most likely to be diverted to their stores. Because McDonald's purposefully locates new stores where they will not undercut existing franchisees' business, McDonald's franchisees do not have to compete with each other, a substantial advantage in the highly competitive fast food industry.

Second, McDonald's policy of owning all of its own restaurants assures that the stores remain part of the McDonald's system. McDonald's franchise arrangements are not static: franchisees retire or die; occasionally they do not live up to their franchise obligations and must be replaced; even if no such contingency intervenes, the agreements normally expire by their own terms after twenty years. If franchisees owned their own stores, any of these events could disrupt McDonald's business and have a negative effect on the system's goodwill. Buildings whose architecture identified

them as former McDonald's stores would sit idle or be used for other purposes. Replacement franchisees would have to acquire new and perhaps less desirable sites, a much more difficult and expensive process after the surrounding business area has matured. By owning its own stores, McDonald's assures its continued presence on the site, maintains the store's patronage even during management changes and avoids the negative publicity of having former McDonald's stores used for other purposes. By preserving the goodwill of the system in established markets, company store ownership produces attendant benefits for franchisees.

Third, because McDonald's acquires the sites and builds the stores itself, it can select franchisees based on their management potential rather than their real estate expertise or wealth. Ability to emphasize management skills is important to McDonald's because it has built its reputation largely on the consistent quality of its operations rather than on the merits of its hamburgers. A store's quality is largely a function of its management. McDonald's policy of owning its own stores reduces a franchisee's initial investment, thereby broadening the applicant base and opening the door to persons who otherwise could not afford a McDonald's franchise.[8] Accordingly, McDonald's is able to select franchisees primarily on the basis of their willingness to work for the success of their operations. Their ability to begin operating a McDonald's restaurant without having to search for a site, negotiate for the land, borrow hundreds of thousands of dollars and construct a store building is of substantial value to franchisees.

Finally, because both McDonald's and the franchisee have a substantial financial stake in the success of the restaurant, their relationship becomes a sort of partnership that might be impossible under other cir-

7. Nor would requiring corporate approval of franchisees' site selection decisions be a satisfactory alternative. McDonald's regional manager testified that the Company's planning and acquisition experts are unlikely to stay with McDonald's if their roles become purely advisory.

8. The record establishes that the Principes could not have obtained financing to construct their first restaurant themselves.

cumstances. McDonald's spends close to half a million dollars on each new store it establishes. Each franchisee invests over $100,000 to make the store operational. Neither can afford to ignore the other's problems, complaints or ideas. Because its investment is on the line, the Company cannot allow its franchisees to lose money. This being so, McDonald's works with its franchisees to build their business, occasionally financing improvements at favorable rates or even accepting reduced royalty payments in order to provide franchisees more working capital.

All of these factors contribute significantly to the overall success of the McDonald's system. The formula that produced systemwide success, the formula that promises to make each new McDonald's store successful, that formula is what McDonald's sells its franchisees. To characterize the franchise as an unnecessary aggregation of separate products tied to the McDonald's name is to miss the point entirely. Among would be franchisees, the McDonald's name has come to stand for the formula, including all that it entails. We decline to find that it is an illegal tie in. *Cf. Kugler v. Aamco Automatic Transmissions, Inc.*, 460 F.2d 1214, 1215–16 (8th Cir. 1972) (franchise and mandatory advertising constitute a single product); *In re 7–Eleven Franchise Litigation*, 1974–2 Trade Cases ¶ 75,429 (N.D.Cal.) (convenience store franchise package is not separable into tied and tying products).

We have examined the Principes' other contentions and do not believe they warrant extended discussion. The security deposit note was just that: evidence of a security deposit on a lease which we have held was a legitimate part of the franchise package. The evidentiary rulings of the district court would not require reversal even if erroneous. The jury's unsolicited comment that the Principes had been wronged was expressly qualified by their statement that price fixing was not the reason. The district court correctly determined that the note did not affect the integrity of the jury verdict.

Affirmed.