**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICK-MIK ENTERPRISES INC.; MIKE
M. MADANI; ALFRED BUCZKOWSKI,
on behalf of themselves and those
similarly situated,
            *Plaintiffs-Appellants,*

            v.

EQUILON ENTERPRISES, LLC, doing
business as Shell Oil Products US,
            *Defendant-Appellee.*

No. 06-55937

D.C. No.
CV-05-08212-R

OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
February 12, 2008—Pasadena, California

Filed July 11, 2008

Before: Betty B. Fletcher and N. Randy Smith,
Circuit Judges, and Samuel P. King,* District Judge.

Opinion by Judge King

---

*The Honorable Samuel P. King, Senior United States District Judge
for the District of Hawaii, Sitting by Designation.

**COUNSEL**

Thomas P. Bleau (argued), Martin R. Fox, Gennady L. Lebedev, H. Michael Song, Bleau Fox & Fong, Los Angeles, California, for the plaintiffs-appellants.

Bradley S. Phillips (argued), Fred A. Rowley, Jr., Munger Tolles & Olson, Los Angeles, California, for the defendant-appellee.

**OPINION**

KING, District Judge:

Equilon Enterprises, LLC ("Equilon") does business as Shell Oil Products. Equilon's standard franchise agreement requires its franchisees, Shell and Texaco gasoline stations, to use Equilon to process credit-card transactions. In addition to payment for sales of petroleum products, Equilon allegedly gets (1) transaction fees associated with the processing, or (2) some kind of unspecified "kickback" from unidentified banks that process the transactions, or both. Rick-Mik Enterprises, Inc., Mike M. Madani, and Alfred Buczkowski (collectively "Rick-Mik") are Equilon franchisees who — on behalf of themselves and other, similarly-situated Equilon franchisees — allege that Equilon violated antitrust laws by illegally tying two distinct products (the franchises and the credit-card processing services). Rick-Mik contends franchisees could pay

lower transaction fees from others for credit-card processing. Rick-Mik also alleges that Equilon illegally agreed with banks to price-fix processing fees.

The district court dismissed the antitrust and related state-law counts from Rick-Mik's complaint. We affirm because: (1) Rick-Mik's complaint failed to allege market power in the relevant market; (2) in the alleged franchising context, credit-card processing services are not a product distinct from the franchise itself; (3) the price-fixing allegations were impermissibly vague; and (4) Rick-Mik waived the opportunity to attempt to cure these deficiencies.

## BACKGROUND

Rick-Mik appeals an order dismissing five of six counts of its complaint alleging antitrust violations against Equilon. The complaint alleged an unlawful tie between Equilon's franchises (the "tying" product) and credit- and debit-card processing services (the "tied" product) which Equilon requires as part of the franchise agreement.

Shortly after Rick-Mik's complaint was filed, in lieu of an answer, Equilon moved to dismiss counts one (violation of the Sherman Act, 15 U.S.C. § 1, for unlawful tying); two (violation of the Sherman Act, 15 U.S.C. § 1, for unlawful price fixing); three (California state law violations for unlawful tying); four (California state law violations for unlawful price-fixing); and six (California state law violations for unfair competition). Count five, which Equilon did not move to dismiss, claimed violations of California's franchise investment law.

Because the appeal is from an order granting a motion to dismiss, we assume the factual allegations of the complaint are true. *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 984 (9th Cir. 2000). The question is whether the allega-

tions, together with the attachments to the complaint,[1] set forth viable antitrust theories. The relevant parts of the complaint are set forth verbatim:

20. EQUILON refines and markets substantial volumes of gasoline and other petroleum products under both the Shell and Texaco brand names in all or parts of 31 states, selling petroleum products to approximately 9,000 Shell and Texaco-branded retail outlets.

21. Combined with its affiliate, Motiva Enterprises LLC (hereafter "Motiva"), EQUILON and Motiva (collectively referred to as "Retail USA" by Shell Oil Company, the parent company of both EQUILON and Motiva) rank number one in the industry in branded gasoline stations. At 13 percent, EQUILON and Motiva also rank number one in total gallons of gasoline sold in the United States.

22. EQUILON's annual gross revenue is approximately $24 billion.

23. EQUILON is number one in market share in Oregon, Arizona, Nebraska, Oklahoma, Missouri, Arkansas and Kentucky. EQUILON is number two in market share in Alaska, Hawaii, California, Nevada, Idaho, Wyoming, Colorado, New Mexico, Indiana and Illinois.

24. EQUILON has four refineries, refining approximately 753,000 barrels of petroleum products per day and owns a 50 percent interest in Motiva's

---

[1]"In determining whether a plaintiff can prove facts in support of his or her claim that would entitle him or her to relief, we may consider facts contained in documents attached to the complaint." *Tyler v. Cuomo*, 236 F.3d 1124, 1131 (9th Cir. 2000) (citation omitted).

three refineries, refining approximately 865,000 barrels of petroleum products per day.

25. EQUILON owns an interest in approximately 10,000 miles of pipeline used to transport its petroleum products throughout the United States.

26. With 75 percent of all Americans living within five miles of a Shell-branded gasoline station, EQUILON and Motiva serve, on average, more than six million customers per day and sell approximately 19 billion gallons of gasoline per year, most of which is purchased by customers' credit and/or debit cards issued by thousands of banks, banking associations and financial institutions throughout the States.

27. EQUILON requires each and everyone one [sic] of its Shell and Texaco-branded franchisees to execute a standardized "Retail Sales Agreement," including Plaintiffs, before they can purchase petroleum products from EQUILON for resale to consumers. A true and correct copy of a Plaintiff RICK-MIK ENTERPRISES, INC.'s Retail Sales Agreement effective September 1, 2004, is attached hereto and incorporated herein by reference as Exhibit "A".

28. Plaintiff RICK-MIK ENTERPRISES, INC.'s Retail Sales Agreement attached hereto as Exhibit "A" is virtually identical to all of the other Retail Sales Agreements EQUILON requires each one of its franchisees to sign before they can purchase petroleum products from EQUILON for resale to consumers.

29. EQUILON's Retail Sales Agreements requires [sic] Plaintiffs, and the Class that Plaintiffs represent, to accept all credit and debit cards authorized exclusively by EQUILON and requires that all credit

and debit card transactions at each one of its franchisees' stations, including Plaintiffs' stations, to be [sic] processed solely through EQUILON, which Plaintiffs must accept as a condition of EQUILON before they can purchase Shell and/or Texaco petroleum products from EQUILON for resale to consumers.

30. Paragraph 12(a) of the Retail Sales Agreement states, in part "As long as Seller [EQUILON] elects to accept specified credit cards, credit identifications, debit cards, pre-paid cards, or other transaction authorization cards (collectively "Transaction Cards") in the state in which Retailer's Station is located, Retailer [Plaintiffs] shall accept all Transaction Cards identified in Seller's Transaction Card guide ("Guide") for the purchase of authorized products and services. Retailer shall account for and process all such transactions in strict compliance with the terms set forth in the Guide, as may be amended by Seller from time to time."

31. Paragraph 12(b) of the Retail Sales Agreement states, in part "Seller [EQUILON] shall accept from Retailer [Plaintiffs] all transactions generated as a result of purchases made with authorized Transaction Cards and processed in accordance with the terms of the Guide. At Seller's option, Seller shall pay the amount of the transactions to Retailer, after deducting any processing fee in effect under Seller's then current Guide."

32. In accordance with its Retail Sales Agreement, EQUILON processes all its franchisees' daily credit and debit card sales in batches through its own computerized Electronic Point of Sale ("EPOS") system and charges each franchisee a processing fee. Each franchisee's daily credit and debit card batches are

then held by EQUILON and later applied to the franchisee's next gasoline invoice when due after deducting EQUILON's processing fee, resulting in a delay in payment to the franchisee.

33. Absent EQUILON's requirement that its franchisees process all credit and debit card transactions through EQUILON, Plaintiffs, and the Class that Plaintiffs represent, would be able to purchase credit and debit card processing services through many other credit and debit card processing service providers on more favorable terms and conditions.

34. Plaintiffs are informed, believe and based thereon allege that EQUILON has conspired with numerous banks, banking associations and financial institutions throughout the United States to fix, peg and stabilize the price of credit and debit card processing fees, commonly referred to as the "Merchant Discount Fee," charged to Plaintiffs and the members of the Class Plaintiffs represent.

35. Plaintiffs are informed, believe and based thereon allege that EQUILON receives compensation in the form of a "kick back" from numerous banks, banking associations and financial institutions throughout the United States from the Merchant Discount Fee as consideration for its unlawful agreement to fix prices of credit and debit card processing fees and tying arrangement, which is not reimbursed to EQUILON's franchisees.

36. The exploration, production, transportation, storage, refining, distribution, marketing, and selling of crude oil and gasoline is carried on in and substantially affects interstate and foreign commerce, and the conspiracy among EQUILON and the numerous banks, banking associations and financial

institutions throughout the United States to fix the price of credit and debit card processing fees charged to retail gasoline dealers substantially affects, impedes, and unreasonably restrains competition by credit and debit card processing service providers within the retail gasoline industry and between and among the various states of the United States, and foreign countries and the United States.

37. By reason of the violations alleged herein, Plaintiffs, and the members of the Class Plaintiffs represent, have paid and continue to pay higher credit and debit card processing fees that than [sic] they would have in a free and competitive market.

38. By reason of the violations alleged herein, Plaintiffs, and all persons similarly situated, have sustained injury to their franchises in amounts yet to be ascertained, including but not limited to over-charges in credit and debit card processing fees, loss of sales, profits and business goodwill, increased prices paid to defendants for gasoline and other petroleum products, the value of their businesses as going concerns and the increased costs of doing business, including any debts incurred.

Equilon's standard franchise agreement or "Retail Sales Agreement," and Shell's Franchise Disclosure Statement were attached to the complaint. A key provision is paragraph 12 of the Disclosure Statement regarding "Transaction Cards." Paragraph 12 provides in full:

### 12.   TRANSACTION CARDS.

(a) As long as Seller [Equilon] elects to accept specified credit cards, credit identifications, debit cards, pre-paid cards, or other transaction authoriza-tion cards (collectively "Transaction Cards") in the

state in which Retailer's Station is located, Retailer shall accept all Transaction Cards identified in Seller's Transaction Card guide ("Guide") for the purchase of authorized products and services. Retailer shall account for and process all such transactions in strict compliance with the terms set forth in the Guide, as may be amended by Seller from time to time. If Seller amends the Guide, Seller shall provide Retailer with notice. Seller may assess Buyer a Transaction Card processing fee (which includes any VSAT related charges) for providing such services.

(b) Seller shall accept from Retailer all transactions generated as a result of purchases made with authorized Transaction Cards and processed in accordance with the terms in the Guide. At Seller's option, Seller shall pay the amount of the transactions to Retailer, after deducting any processing fee in effect under Seller's then current Guide, by: (1) check to Retailer; (2) a credit to Retailer's bank account by EFT; or (3) setting off the amount against Retailer's account with Seller.

(c) For each transaction not authorized, disputed by a customer, or otherwise subject to chargeback under the Guide, Seller may either charge the amount to Retailer's account or require Retailer to make immediate refund to Seller, including refund by draft of EFT initiated by Seller, without any deduction for any processing fee.

(d) This Article 12(d) is not applicable to Retailers who lease Retailer's Station from Seller. In order to provide efficient service to the motoring public, Retailer shall comply with Seller's software and hardware standards, established from time to time by Seller, relating to electronic Point of Sale ("EPOS") systems, including, but not limited to, Seller

approved compatible hardware, customer activated terminals, integrated and non-integrated EPOS systems, and other requirements necessary to electronically accept and process the Transaction Cards at all times during the term of this Agreement. Retailer shall upgrade the EPOS system with any new release of the software within 9 months after notice from Seller. Further, if Seller loans or leases any imprinter, EPOS terminal, or other related equipment to Retailer in connection with acceptance of the Transaction Cards, Retailer shall (1) comply with the terms of the Guide, (2) execute any applicable Seller agreements, relating to the use of such equipment and (3) reimburse Seller for any charges for use of such equipment (whether third party or internal) incurred by Seller.

(e) Without limiting any rights available to Seller, if Retailer fails to comply with this article or the Guide, Seller may limit or terminate Retailer's right to participate in Seller's Transaction Card program. Further, Seller may terminate its Transaction Card program at any time upon notice to Retailer.

The district court granted Equilon's motion to dismiss "in its entirety." Equilon then filed an answer to the remaining claim, count five. After Equilon moved for summary judgment on count five, the parties stipulated to dismiss that count so judgment could be entered and Rick-Mik could appeal the dismissal of the antitrust counts. This timely appeal followed.

## STANDARD OF REVIEW

The court reviews de novo the district court's order of dismissal for failure to state an antitrust claim. *Knevelbaard Dairies*, 232 F.3d at 984 (citation omitted).

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the

pleader is entitled to relief[.]" Nevertheless, in antitrust matters, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1965 (2007) (citations omitted). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Id.* at 1964-65 (internal quotation marks, brackets, and citation omitted). A Sherman Act § 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 1965.

In *Twombly*, at least in antitrust matters, the Supreme Court "retired" the familiar language derived from *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), which provided "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 127 S. Ct. at 1968 (quoting *Conley*). *Twombly* opined that the "no set of facts" language "has earned its retirement" and "is best forgotten[.]" *Id.* at 1969. Thus, "[a]t least for the purposes of adequate pleading in antitrust cases, the Court specifically abrogated the usual 'notice pleading' rule[.]" *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 n.5 (9th Cir. 2008).

## DISCUSSION

### I. Tying Claim

[1] "A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008) (citation omitted). "To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Id.* (citations omitted). "Tying arrangements are forbidden on the

theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product." *Id.*

"For a tying claim to suffer per se condemnation, a plaintiff must prove: (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." *Id.* at 913 (citation omitted).

**[2]** Not all tying arrangements are illegal. Rather, ties are prohibited where a seller "exploits," "controls," "forces," or "coerces" a buyer of a tying product into purchasing a tied product. *See, e.g.*, *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink*, 547 U.S. 28 (2006); *PeaceHealth*, 515 F.3d at 913. The injury is reduced competition in the market for the tied product. *See Jefferson Parish*, 466 U.S. at 12 ("When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated."). As the Supreme Court recently reiterated, "the justification for the challenge [against ties] rested on either an assumption or a showing that the defendant's position of power in the market for the tying product was being used to restrain competition in the market for the tied product." *Illinois Tool Works Inc.*, 547 U.S. at 34. Thus, "in all cases involving a tying arrangement, the plaintiff must prove that

the defendant has market power in the tying product." *Id.* at 46.[2] And to prove it, it must first be properly alleged.

    a.   *The market power allegations are flawed.*

The alleged tying product here is gasoline franchises. Rick-Mik has a contract for an Equilon franchise to sell Shell branded gasoline and diesel. The alleged tied product is credit-card processing services. Rick-Mik alleges it cannot get a franchise without the "tied" credit-card processing services.

**[3]** Rick-Mik's complaint does not allege that Equilon has market power in the relevant market, which is the market for the tying product — gasoline franchises. Indeed, other than stating that "[Equilon] rank[s] number one in the industry in branded gasoline stations," there are no specific allegations at all as to the franchise market. The complaint alleges nothing about, for example, what percentage of gasoline franchises are Equilon's (Shell/Texaco) as compared to other franchises like Chevron, Mobil, Marathon Oil, or Union 76. There are no factual allegations as to the percentage of gasoline retail sales that are made through *non*-franchise outlets. There are no factual allegations regarding the amount of power or control that Equilon has over prospective franchisees. There are no factual allegations regarding the relative difficulty of a franchisee to switch franchise brands.

---

    [2]In so holding, the Court overruled prior precedent that indicated tying arrangements involving patents provided presumptive market power. *Illinois Tool Works Inc.*, 547 U.S. at 42. The Court traced the history of anti-trust tying jurisprudence, observing that, in the earlier part of the 20th Century, the Court disapproved of such arrangements. *Id.* at 33-34. The trend has changed. "Over the years, however, this Court's strong disapproval of tying arrangements has substantially diminished." *Id.* at 35. A similar trend in antitrust law is seen in other relevant cases as well. *See, e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 127 S. Ct. 2705, 2725 (2007) (requiring application of the rule of reason, abrogating a per se analysis for vertical price restraint allegations and explicitly overruling past precedent).

**[4]** If Equilon lacks market power in the gasoline-franchise market, there can be no cognizable tying claim. For, in that case, Equilon has no power to force, exploit, or coerce a franchisee to purchase a tied product such as credit card processing (if the processing is a distinct product for tying purposes) or to affect competition in the tied-product market. Such an arrangement would not raise antitrust concerns. *Jefferson Parish*, 466 U.S. at 11-12. A failure to allege power in the relevant market is a sufficient ground to dismiss an antitrust complaint. *Cf., e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 443 (3d Cir. 1997) ("Because plaintiffs failed to plead any relevant tying market, the claim was properly dismissed."); *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act [restraint of trade] claim.") (citation omitted); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 671 (7th Cir. 1985) ("[Plaintiffs] did not establish market power . . . as a matter of law. This failure makes every other element of the [tying] anti-trust case irrelevant.").

Rick-Mik argues that it alleged sufficient facts to *infer* that Equilon has sufficient economic power in the gasoline-franchise market, which has significant barriers to entry. It points to statistics indicating Equilon is an important player in the petroleum industry. According to paragraphs 20-26 of the complaint: (1) Equilon sells petroleum products to approximately 9,000 Shell and Texaco-branded retail outlets; (2) it ranks first in the industry in branded gasoline stations; (3) at 13 percent of the market, it ranks first in total gallons of gasoline sold in the United States; (4) it has annual gross revenues of approximately $24 billion; (5) it is number one or two in gasoline market share in 17 states; (6) it has four refineries, refining approximately 753,000 barrels of petroleum products per day and owns a 50 percent interest in Motiva's three refineries, refining approximately 865,000 barrels of petroleum products per day; (7) it owns an interest in approximately 10,000 miles of pipeline used to transport its petroleum prod-

ucts throughout the United States; and (8) it serves, on average, more than six million customers per day and sells approximately 19 billion gallons of gasoline per year, most of which is purchased by customers' credit or debit cards issued by thousands of banks, banking associations and financial institutions throughout the United States.

**[5]** All of those allegations, however, relate to the *retail* gasoline market — a market where Rick-Mik is a seller — not the relevant market for franchises where it is a buyer. Further, the statistics alleged in the complaint do not distinguish between franchise-based sales and other potential types of sales (e.g., sales by directly-owned outlets or sales to other distributors). Thus, the complaint fails to allege market power in the relevant market.

Nor is Rick-Mik's complaint saved by the allegation that "Shell and Texaco-branded gasolines are protected by various trademarks, copyrights and patents providing EQUILON sufficient economic power over Plaintiffs in connection with its tying products to appreciably restrain competition in the tied product market." Even construing that allegation as one alleging market power in the gasoline franchise market as opposed to the gasoline retail market, it lacks the factual specificity required "to raise a right to relief above the speculative level." *See Twombly*, 127 S. Ct. at 1965. Because intellectual property rights are no longer presumed to confer market power, *see Illinois Toolworks Inc.*, 547 U.S. at 42-43, Rick-Mik's conclusory allegation that Equilon's intellectual property rights nonetheless do confer market power, unaccompanied by supporting facts, is insufficient.

Finally, the complaint's allegation of a contractual franchise relationship also fails to plead market power. A tying claim generally requires that the defendant's economic power be derived from the market, not from a contractual relationship that the plaintiff has entered into voluntarily. *See, e.g.*, *Queen City Pizza, Inc.*, 124 F.3d at 443 ("where the defen-

dant's 'power' to 'force' plaintiffs to purchase the alleged tying product stems not from the market, but from plaintiffs' contractual agreement to purchase the tying product, no claim will lie."); *United Farmers Agents Ass'n v. Farmers Ins. Exch.*, 89 F.3d 233, 236-37 (5th Cir. 1996) ("Economic power derived from contractual agreements such as franchises . . . 'has nothing to do with market power, ultimate consumers' welfare, or antitrust.' ") (citation omitted); *Chawla v. Shell Oil Co.*, 75 F. Supp. 2d 626, 639-40 (S.D. Tex. 1999) (following *United Farmers*); *cf. Maris Distrib. Co. v. Anheuser-Busch*, 302 F.3d 1207, 1222 (11th Cir. 2002) ("The fact that Anheuser-Busch had considerable power over many aspects of Maris's business by virtue of the provisions of the contract to which they agreed (at least 3 separate times) reveals little about the issue of whether Anheuser-Busch had market power in the broader, relevant market for the purchase and sale of equity ownership interests in beer distributorships."). While the allegation of a contractual relationship does not necessarily doom a tying claim at the pleading stage, it also does not remedy a complaint's failure to properly plead market power.

**[6]** In sum, the market power allegations of Rick-Mik's complaint are inadequate.

   b.   *Credit-card processing is not a distinct product.*

There is another fatal flaw in Rick-Mik's complaint. Equilon's franchises are not a separate and distinct product from the credit-card processing services that are part of the franchise.

**[7]** Franchises, almost by definition, necessarily consist of "bundled" and related products or services — not separate products. *See Phillips v. Crown Cent. Petroleum Corp.*, 602 F.2d 616, 628 (4th Cir. 1979) ("[T]he very essence of a franchise is the purchase of several related products in a single competitively attractive package."); *Will*, 776 F.2d at 670-71 & n.1 (" '[F]ranchises' (the tying product here) are just names

and methods of doing business, not 'products' and some courts have held that as a matter of law there cannot be a tie-in between a name and a product . . . . [A] method of doing business (the franchise) is not sold separately from the ingredients that go into the method of business."); *see also Chawla*, 75 F. Supp. 2d at 639-40 (rejecting similar tying theory that dealers were being coerced into "utiliz[ing] the bank chosen by Defendants to process the associated credit card transactions" because "[r]eceipt and processing of retail customers' payments for retail gasoline purchases is an integral part of a gasoline dealer's function.").

With franchises, "the proper inquiry is . . . whether [the allegedly tied products] are integral components of the business method being franchised. Where the challenged aggregation is an essential ingredient of the franchised system's formula for success, there is but a single product and no tie in exists as a matter of law." *Principe v. McDonald's Corp.*, 631 F.2d 303, 309 (4th Cir. 1980).

[8] Here, Equilon's credit card services are an essential part of its franchise. Its agreement authorizes Equilon to use credit card proceeds to pay off a franchisee's account (i.e., money the franchisee owes Equilon for the gasoline Equilon delivers to the franchisee). The agreement also authorizes Equilon to charge or refund unauthorized transactions to the franchisee, helping secure the integrity of point-of-sale transactions. Equilon pays the amount of the credit transactions (minus a transaction fee) to the franchisee by check, by crediting its bank account, or by setting that amount off from the amount in the franchisee's account with Equilon. The arrangement gives Equilon some ability to ensure the quality and reliability of credit card processing and helps guard against franchise default and unauthorized transactions. *See Sheridan v. Marathon Petroleum Co. LLC*, ___ F.3d ___, 2008 WL 2486581, at *5 (7th Cir. June 23, 2008) (rejecting similar tying allegations, observing that "[t]he combination of card and card processing enables [the gasoline franchisor] to offset in an

economical and expeditious manner revenues from credit card sales against costs of gasoline sold to the dealers.").

**[9]** Equilon points to the many other areas which are part and parcel of a franchise: signs, advertising, marketing, appearance, as well as methods of delivery and payment. Similarly, the method of receiving and processing credit transactions is an integral part of the franchise's operation. The franchise and the method of processing credit transactions are not separate products, but part of a single product (the franchise).[3]

There are also no separate products under a test set forth in *Jefferson Parish*. The existence of distinct products depends upon "the character of the demand for the two items." 466 U.S. at 19. There must be "a sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market[.]" *Id.* at 21. To determine this, the "purchaser demand" test of *Jefferson Parish* "examine[s] direct and indirect evidence of consumer demand for the tied product separate from the tying product." *United States v. Microsoft Corp.*, 253 F.3d 34, 86 (D.C. Cir. 2001). "Direct evidence addresses the question whether, when given a choice, consumers purchase the tied good from the tying good maker, or from other firms." *Id.* "Indirect evidence includes the behavior of firms without market power in the tying good market, presumably on the notion that (competitive) supply follows demand. If competitive firms always

---

[3]Rick-Mik relies on *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971), and *Roberts v. Elaine Powers Figure Salons*, 708 F.2d 1476 (9th Cir. 1983) to argue that control evidences economic power by Equilon over its franchisees. Those cases relied on the old theory that ties are "presumptively unlawful," *Elaine Powers*, 708 F.2d at 1479, and that the trademarks did not extend to the tied product, *Chicken Delight*, 448 F.2d at 48. People don't generally think of Shell when they think of credit-card processing; they think of gasoline. But those tests are no longer relevant after *Jefferson Parish* and *Illinois Toolworks, Inc..*

bundle the tying and tied goods, then they are a single product." *Id.*

**[10]** Applying the "character of demand" test, Rick-Mik's complaint fails to plead facts necessary to assess whether credit-card services are distinct from the franchise agreements. The relevant "purchaser" is the franchisee (not the general consumer of credit card processing services), but the complaint sets forth no allegations about the franchisee market's demand for credit card services. One could assume there is a billion dollar market for credit card processing in the general economy, but, under *Jefferson Parish*, the question is what is the market for separate credit card processing services among franchisees in general (or gasoline franchisee in particular). There are no facts pled indicating the existence of a separate market for credit-card processing services among franchisees.

**[11]** Thus, for several reasons, we conclude that separate products are not at issue here.[4] With franchises, the franchisee knows the contractual limitations and duties before entering into the contract. A complaint about such contractual obligations is not an antitrust matter. *See, e.g.*, *Queen City Pizza*, 124 F.3d at 443; *United Farmers*, 89 F.3d at 236.

## II. Price Fixing

The price-fixing claim fails for vagueness. After *Twombly*, we readily conclude that Rick-Mik's complaint lacks specific details of an illegal price-fixing scheme. *See Twombly*, 127 S. Ct. at 1964-65 ("[A] formulaic recitation of the elements of a cause of action will not do.") (citation and internal editorial marks omitted). A Sherman Act § 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 1965.

---

[4]Given this conclusion, we need not consider whether the tying allegations would also fail under the "rule of reason."

The complaint merely alleges that Equilon "conspired with numerous banks, banking associations and financial institutions throughout the United States to fix, peg and stabilize the price of credit and debit card processing fees, commonly referred to as the 'Merchant Discount Fee,' charged to Plaintiffs and the members of the Class Plaintiffs represent." It continues: "EQUILON receives compensation in the form of a 'kick back' from numerous banks, banking associations and financial institutions throughout the United States from the Merchant Discount Fee as consideration for its unlawful agreement to fix prices of credit and debit card processing fees and tying arrangement, which is not reimbursed to EQUILON's franchisees."

**[12]** All that is alleged is there was an agreement on price. The co-conspirator banks or financial institutions are not mentioned. The nature of the conspiracy or agreement is not alleged. The type of agreements are not alleged. And the discernible theories do not implicate antitrust laws.

If the complaint is that Equilon agreed with banks on a price to provide credit card processing services for franchisees, it would be an "[o]rdinary sales contract[,]" not an illegal antitrust agreement. *See 49er Chevrolet, Inc. v. General Motors Corp.*, 803 F.2d 1463, 1467 (9th Cir. 1986).

If Equilon was a competitor with the unidentified banks it would be a "horizontal price-fixing" theory — an agreement between competitors to price-fix in a market. But Equilon does not compete with banks in the credit-card services market, and the complaint does not allege such a price-fixing conspiracy.

If the agreement was to set a minimum retail price — credit card services purchased from banks by Equilon and then resold to franchisees — such a vertical "resale price maintenance" scheme is not a valid per se antitrust violation. *See Leegin Creative Leather Prods.*, 127 S. Ct. at 2725 (requiring

application of the rule of reason and abrogating a per se analysis for vertical price restraint allegations).

**[13]** All that is alleged is that Equilon receives "kickbacks" (or perhaps commissions) from banks for processing the transactions of Equilon's franchisees. Such an arrangement does not violate antitrust laws. *See Mesirow v. Pepperidge Farm, Inc.*, 703 F.2d 339, 343 (9th Cir. 1983) (rejecting price-fixing claim where a distributor delivered and maintained a manufacturer's products for a commission).[5] The district court correctly determined that the complaint failed to state a claim for illegal price-fixing.

## III.  Leave to Amend

When Rick-Mik opposed Equilon's motion to dismiss before the district court, Rick-Mik mentioned that it should be given leave to amend its complaint "if the district court was inclined to find a failure to state a claim." The district court, however, simply granted Equilon's motion to dismiss in its entirety (as to five counts). After dismissal of those counts, Rick-Mik made no effort to amend.

**[14]** Rick-Mik did not mention leave-to-amend in its opening brief on appeal. Equilon pointed out this omission. Rick-Mik responded in its *reply* brief that it should have at least been given the opportunity to amend its complaint. By waiting until its reply brief, Rick-Mik waived the argument regarding leave to amend. *See Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) ("[W]e 'review only issues which are argued specifically and distinctly in a party's opening brief.' ") (quoting *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994)).

---

[5]The state law antitrust claims are derivative of the federal law claims. Because the federal claims fail, the state law claims fail. *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001).

Such waiver is not absolute; the court can "review an issue not raised in a petitioner's opening brief if the failure to do so would result in manifest injustice." *Alcaraz v. INS*, 384 F.3d 1150, 1161 (9th Cir. 2004) (internal quotation marks omitted). But the "manifest injustice" exception does apply here.

First, Rick-Mik did not even need permission to amend before the district court if it truly wanted to amend its complaint. Under Federal Rule of Civil Procedure 15(a), "a party may amend its pleading once as a matter of course . . . before being served with a responsive pleading." A motion to dismiss is not a responsive pleading within the meaning of Rule 15(a). *See, e.g.*, *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1158 n.5 (9th Cir. 2007). Here, Equilon had only filed a motion to dismiss; it had not answered. Rick-Mik could have responded to the motion by amending its complaint. *Mayes v. Leipziger*, 729 F.2d 605, 607 (9th Cir. 1984). And it could have filed an amended complaint even *after* the district court granted the motion. *Id.* (" 'Neither the filing nor granting of . . . a motion [to dismiss] before answer terminates the right to amend; an order of dismissal denying leave to amend at that stage is improper[.]' ") (quoting *Breier v. Northern Cal. Bowling Proprietors' Ass'n*, 316 F.2d 787, 789 (9th Cir. 1963)). Under Rule 15(a), Rick-Mik had an absolute right to amend, which ended upon the filing of a "responsive pleading" (e.g., an answer) " 'or the entry of final judgment following dismissal of its action.' " *Id.* (quoting *Worldwide Church of God, Inc. v. State of Cal.*, 623 F.2d 613, 616 (9th Cir. 1980)).[6]

Second, assuming Rick-Mik still had a right to amend its complaint after the district court's dismissal, it waived the right again by allowing judgment to enter so it could appeal the dismissal on the merits. *See Jarvis v. Regan*, 833 F.2d 149, 155 (9th Cir. 1987) ("Where a final judgment is entered

---

[6]Equilon filed an answer shortly after the district court's order granting its motion to dismiss. The answer, however, only responded to the remaining count (count five) that was not addressed in the motion to dismiss.

following dismissal of an action, the plaintiff no longer has the right to amend the complaint as a matter of course.") (citations omitted). After the district court dismissed the antitrust counts, Rick-Mik stipulated with Equilon to dismiss the remaining count. It allowed judgment to enter specifically so that it could appeal the granting of the motion to dismiss the other counts. By doing so, it waived its right to amend. *See Univ. Club v. City of New York*, 842 F.2d 37, 39 (2d Cir. 1988) ("[The district court] allowed the plaintiffs . . . 'leave to replead a selective prosecution claim if a meaningful one can be asserted.' . . . That opportunity was, of course, waived by [their] decision to appeal rather than amend their complaint."); *cf.* 6 Charles Alan Wright et al., *Federal Practice and Procedure* § 1483, at 588 (2d ed. 1990) ("[Dismissing with leave to amend] will afford the party against whom the dismissal is granted the option of amending the pleading or of having a judgment entered against him and taking an appeal.").

**[15]** Accordingly, we decline to remand to allow Rick-Mik to amend its complaint.

## CONCLUSION

Rick-Mik's complaint was fundamentally flawed. The complaint failed to allege market power in the relevant tying market (gasoline franchises, not retail gasoline). The franchises are not separate products, for tying purposes, from credit-card processing services; instead, such processing is an inherent part of the franchises. The price-fixing allegations were impermissibly vague. And questions about further amendment of the complaint were waived.

**AFFIRMED.**