**PACKAGING SYSTEMS, INC., Plaintiff,**

v.

**PRC–DESOTO INTERNATIONAL, INC.; and PPG Industries, Inc., Defendants.**

**Case No 2:16–cv–09127–ODW(JPRx)**

United States District Court, C.D. California.

Signed July 14, 2017

Kenneth F. Spencer, Laurence C. Osborn, Baker Keener and Nahra LLP, Los Angeles, CA, James Robert Noblin, Green and Noblin PC, Long Beach, CA, for Plaintiff.

Paul Benedict Salvaty, Hogan Lovells LLP, Los Angeles, CA, John R. Robertson, Pro Hac Vice, Justin Bernick, Pro Hac Vice, Kimberly Rancour, Pro Hac Vice, Hogan Lovells LLP, Washington, DC, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [13]**

OTIS D. WRIGHT, II, UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This is an antitrust action involving competitors in the aerospace sealant industry. Defendants PRC–Desoto International,

Inc. and PPG Industries, Inc. (collectively "PPG") manufacture and distribute aerospace sealant for use in military and commercial aircraft. Plaintiff Packaging Systems, Inc. purchases wholesale quantities of aerospace sealant from PPG, repackages the sealant into special injection kits, and sells the kits on the retail market (usually to aircraft maintenance companies). In August 2016, PPG issued a memo stating that the repackaging of its aerospace sealant for the purposes of resale was prohibited, and that it would stop selling sealant to any reseller that violated this prohibition. Plaintiff subsequently filed this action, alleging myriad violations of state and federal antitrust and unfair competition laws. PPG has moved to dismiss Plaintiff's complaint. (ECF No. 13.) For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** its Motion.[1]

## II. BACKGROUND

### A. Uses of Aerospace Sealant

PPG manufactures and distributes aerospace sealant. (*See* First Am. Compl. ("FAC") ¶ 29, ECF No. 11.) Aerospace sealant has a variety of uses on aircraft, including sealing fuel tanks, smoothing surfaces, and preventing moisture intrusion. (*Id.* ¶ 13.) Moreover, as one can imagine, aerospace sealant must be able to withstand a number of harsh environmental conditions, such as wide variations in temperature and pressure, inclement weather, ultraviolet light, noise, vibration, abrasion, moisture, fatigue, and high g-forces. (*Id.*) Because of this, aircraft manufacturers issue stringent specifications for any aerospace sealant used on their air-

craft, and maintain a list of qualified products that meet these requirements. (*Id.* ¶¶ 17–18.) To land on a manufacturer's qualified product list ("QPL"), the sealant must pass rigorous testing at either Wright–Patterson Air Force Base or the Federal Aviation Administration. (*Id.* ¶ 18.) End-users of aerospace sealant—usually aircraft maintenance companies—will virtually never use non-QPL sealant for obvious safety and liability reasons. (*Id.*)

Aerospace sealant comes from the manufacturer as separate pastes that must be mixed together prior to use. (*Id.* ¶¶ 15–16.) Once mixed, there is a relatively short window in which the mixture can be applied to the aircraft—sometimes as short as half an hour. (*Id.*) After the mixture's "working time" has passed, any excess mixture is unusable and must be discarded. (*Id.* ¶ 15.) End-users can mix sealant either by manually mixing the pastes or by using an injection kit. (*Id.* ¶ 16.) An injection kit is a disposable syringe-like tool that stores the pastes in separate compartments and mixes them together when its plunger is depressed. (*Id.* ¶¶ 16, 38.) Not only do injection kits simplify the mixing process, they reduce waste by mixing only the exact amount of sealant needed for one sitting. (*See id.*) However, filling kits with sealant is itself a difficult and labor-intensive process, and thus end-users tend to prefer purchasing the kits pre-filled. (*Id.* ¶ 42.)

### B. Production of Aerospace Sealant

Plaintiff alleges that the production of aerospace sealant is its own unique market. (*Id.* ¶¶ 21–28.)[2] That is, there are no

---

1. After considering the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7–15.

2. Plaintiff also alleges that the U.S. market for production of aerospace sealants is distinct from the foreign production market. (Compl. ¶ 28.) Aerospace sealant manufacturing originated in the United States, and all major

adequate substitutes for QPL-approved aerospace sealants because the properties of aerospace sealant are unique to the needs of aircrafts, and because aerospace sealant must undergo rigorous testing not required of non-aircraft sealants. (*Id.* ¶¶ 21–22.) Pricing for aerospace sealants is therefore highly inelastic. (*Id.* ¶¶ 26–28.)

PPG produces over 90% of the aerospace sealant manufactured and used in the United States. (*Id.* ¶ 29.) According to Plaintiff, PPG is able to maintain such market dominance for two reasons. First, high barriers to entry prevent new competitors from entering the market. (*Id.* ¶ 31.) These barriers include "hundreds of millions of dollars" in startup costs, long delays in profit realization, entrenched distribution networks among preexisting producers, and intellectual property held by such producers covering critical production processes. (*Id.*) Second, PPG has consolidated its power in the market by continuously acquiring other companies in the aerospace sealant industry and the general aerospace industry—including SEMCO, which is one of the two main manufacturers of injection kits.[3] (*Id.* ¶¶ 34–35, 38–39.). This makes PPG a "one-stop shop" for all aerospace products, thus discouraging customers from shopping around for any one particular product. (*Id.* ¶ 35.)

## C. Distribution of Aerospace Sealant

PPG sells sealant in both wholesale and retail quantities. (*Id.* ¶¶ 1, 36.) Generally, resellers buy wholesale quantities of sealant from PPG to sell at retail price to end-users, usually after repackaging the seal-ant into injection kits. (*Id.* ¶¶ 36, 40.) PPG also sells retail quantities of sealant directly to end-users, including sealant packaged into injection kits. (*Id.* ¶¶ 51–53.) PPG uses "application support centers" ("ASCs") to package its sealant. (*Id.* ¶ 53.) These ASCs used to be independent repackaging companies before PPG acquired them. (*Id.* ¶ 51.) According to Plaintiff, PPG's ASCs continue to use the same repackaging procedure that they did prior to being acquired. (*Id.* ¶ 53.)

Plaintiff has been a sealant repackager and reseller since 1976. (*Id.* ¶ 40.) Like other resellers, Plaintiff purchases sealant wholesale from PPG, purchases injection kits from either SEMCO or Techon, fills the kits with sealant, and sells them ready-to-use to the end-user. (*Id.*) Thus, Plaintiff competes with PPG in the retail distribution market. (*Id.* ¶¶ 51–53.) Plaintiff alleges that it has a competitive edge over PPG and other resellers in this market because it (1) maintains a substantial and varied inventory of repackaged sealants and (2) provides end-users with superior customer service. (*Id.* ¶¶ 41–42.) Plaintiff currently generates approximately $10 million in annual revenue from reselling PPG's sealants. (*Id.* ¶ 40.)

Over the years, PPG has attempted to blunt competition in the retail distribution market. This includes: (1) "express[ing an] interest" on more than one occasion in acquiring Plaintiff and turning it into an ASC (*id.* ¶ 58); (2) telling end-users, most notably in 2001 and 2012, that Plaintiff and other non-PPG resellers were not author-

---

companies and agencies responsible for certifying compliance with aircraft specifications (e.g., Boeing, Wright–Patterson AFB, and the FAA) are based in the United States. (*Id.*) Thus, Plaintiff alleges, manufacturers that have facilities and personnel in the United States have a significant advantage over international manufacturers in obtaining the nec-essary QPL-approval for their sealants. (*Id.*) Moreover, the costs and delays associated with international shipping of aerospace sealant "fatally disadvantages" international sealant manufacturers vis-à-vis domestic manufacturers. (*Id.*)

3. The other being Techon. (*Id.* ¶¶ 38, 39.)

ized to repackage PPG sealant, even though at that time PPG had no policy against repackaging (*id.* ¶¶ 1, 59); and (3) increasing the per-unit price of sealant sold in bulk quantity at a faster rate than the per-unit price of sealant sold in retail quantity, which was against industry norm (*id.* ¶ 60).

## D. PPG's Repackaging Prohibition

In August 2016, PPG sent a memo to all of its sealant resellers and distributors, wherein it "confirm[ed] PPG policy" prohibiting the repackaging of its sealants by anyone other than PPG or its ASCs. (*Id.* ¶ 45, Ex. A.) PPG stated that this policy was necessary to ensure the sealant's quality for end-users, and that it would refuse to sell sealant to any reseller that violated this policy. (*Id.*) Plaintiff requested clarification from PPG on the policy, including the reason for the policy and whether Plaintiff could "correct [its] business operations" to alleviate PPG's concerns. (*Id.* at Ex. B.) PPG declined to give a direct answer. (*Id.*)

Plaintiff alleges that the quality control rationale is simply pretext, and that the real reason for this policy is to eliminate the increasingly successful competition in the retail market from non-PPG resellers. (*Id.* ¶ 53.) Plaintiff contends that there is no safety advantage to keeping repackaging in-house at PPG, as evidenced by the fact that its ASCs follow the exact same repackaging procedure that they did before PPG acquired them, and the fact that there were "no significant quality issues" associated with repackaging in the many decades that external repackaging had been around. (*Id.*) Moreover, given PPG's virtual monopoly in the production market, Plaintiff contends that this new policy will allow PPG to monopolize the retail distribution market as well—and in fact has already "vastly reduced" the amount of repackaged aerospace sealant sales by both Plaintiff and other non-PPG repackagers. (*Id.* ¶ 46.) Plaintiff filed this action soon thereafter.

## E. First Amended Complaint

In its First Amended Complaint, Plaintiff asserts the following claims: (1) monopolization in violation of the Sherman Act, 15 U.S.C. § 2; (2) attempted monopolization in violation of the Sherman Act, 15 U.S.C. § 2; (3) tying in violation of the Sherman Act, 15 U.S.C. §§ 1, 2, 4; (4) tying in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16727; (5) intentional interference with prospective economic advantage; (6) secret unearned discounts in violation of the California Unfair Practices Act, Cal. Bus. & Prof. Code § 17045; and (7) unfair competition in violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200. (ECF No. 11.) PPG has moved to dismiss all of Plaintiff's claims. (ECF No. 13.) That Motion is now before the Court for decision.

## III. LEGAL STANDARD

A court may dismiss a complaint for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. Fed. R. Civ. P. 12(b)(6); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To survive a dismissal motion, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The determination whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and com-

mon sense." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). But a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). The court must grant the plaintiff leave to amend if there is any possibility that amendment could cure the deficiencies, even if the plaintiff fails to request such leave. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc).

## IV. DISCUSSION

### A. Monopolization and Attempted Monopolization

PPG argues that Plaintiff's monopolization and attempted monopolization claims fail because Plaintiff does not (and cannot) allege that PPG has an antitrust duty to deal with Plaintiff at all, let alone on terms favorable to its business model. The Court disagrees.

■ The Sherman Act makes it unlawful for any person to "monopolize[ ] or attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. Monopolization and attempted monopolization claims require the plaintiff to establish, among other things, that the defendant engaged in "predatory or anticompetitive conduct"; the mere possession of (or attempt to attain) monopoly power is alone insufficient. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407, 124 S.Ct. 872, 157

L.Ed.2d 823 (2004). Indeed, "[t]he opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth." *Trinko*, 540 U.S. at 407, 124 S.Ct. 872. Thus, monopoly power itself is actually an "important element of the free-market system." *Id.* The Ninth Circuit has also noted that monopolies obtained through competitive superiority (so-called "efficient monopolies") benefit consumers through lower prices, whereas monopolies resulting from predatory conduct tend to lead to higher prices and thus harm consumers ("inefficient monopolies"). *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547–49 (9th Cir. 1991).

■ Anticompetitive conduct is broadly defined as "behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985)). Refusing to deal with a competitor (or limiting the terms on which one will deal with a competitor) is generally not considered anticompetitive, because it has long been the general rule that "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448, 129 S.Ct. 1109, 172 L.Ed.2d 836 (2009); *see also United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Aspen Skiing Co.*, 472 U.S. at 605, 105 S.Ct. 2847; *Trinko*, 540 U.S. at 408, 124 S.Ct. 872. This rule, however, is not absolute. *Lorain Journal Co. v. United States*, 342 U.S. 143, 155, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *Aspen*

*Skiing Co.*, 472 U.S. at 605, 105 S.Ct. 2847; *Trinko*, 540 U.S. at 408, 124 S.Ct. 872. "If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory." *Aspen Skiing Co.*, 472 U.S. at 605, 105 S.Ct. 2847 (quoting R. Bork, The Antitrust Paradox 138 (1978)); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 n.32, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (there must be "legitimate competitive reasons for the refusal [to deal]"). "The leading [Supreme Court] case for § 2 liability based on refusal to cooperate with a rival ... is *Aspen Skiing*," a case that the Court has characterized as a "limited exception" to the refusal-to-deal rule that is "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 408, 124 S.Ct. 872.[4] In *Aspen Skiing*, the defendant controlled three of four ski mountains in a particular area, and the plaintiff controlled the remaining mountain. For years, the two companies had jointly issued all-mountain ski passes and divided the profits among themselves. After the plaintiff refused the defendant's demand that it accept a lower percentage of profits from the joint ski pass, the defendant stopped participating in the joint pass. The plaintiff tried to recreate the joint pass on its own by purchasing tickets from the defendant at retail price and giving them to its customers, but the defendant refused to honor these tickets. *Aspen Skiing*, 472 U.S. at 587–95, 105 S.Ct. 2847.

The Supreme Court held that this constituted an anticompetitive refusal to deal. The Court in *Trinko* identified three facts from *Aspen Skiing* that were critical to establishing liability. First, the defendant terminated a prior profitable course of dealing with the plaintiff (i.e., the joint all-mountain ski pass). *Trinko*, 540 U.S. at 409, 124 S.Ct. 872. Second, the defendant in effect refused to sell ski-lift tickets to plaintiff at even retail price. *Id.* These two facts suggested that the defendant had "'elected to forgo these short-run benefits because it was more interested in reducing competition ... over the long run by harming its smaller competitor.'" *Id.* (quoting *Aspen Skiing*, 472 U.S. at 608, 105 S.Ct. 2847). Third, the product that the defendant was refusing to sell to the plaintiff was one that it was already selling to other customers. *Id.* at 409–10, 124 S.Ct. 872. This fact ensured that remedying the alleged antitrust violation would not require the Court to create from scratch the terms on which the defendant must deal with the plaintiff—a task which courts are generally ill-equipped to handle. Instead, the Court could simply order the defendant to deal with the plaintiff on the same terms as it did everybody else. *See id.* at 408, 124 S.Ct. 872; *see also MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133 (9th Cir. 2004).[5]

---

4. PPG argues that after *Trinko*, *Aspen Skiing* is the *only* exception to the no-duty-to-deal rule. Plaintiff argues that it is not the only exception, and that the Supreme Court's pre-*Aspen Skiing* cases recognizing § 2 liability for refusals to deal—most notably *Eastman Kodak* and *Otter Tail*—retain vitality. While *Trinko* contains some language supporting PPG's position, *see supra*, *Trinko* never expressly overruled either *Eastman Kodak* or *Otter Tail*. Moreover, PPG does not identify, and the Court cannot find, any cases expressly holding that these two cases are no longer good law. However, because the Court concludes that *Aspen Skiing* plausibly applies here, the Court declines to definitely resolve this dispute now.

5. Neither the Supreme Court nor the Ninth Circuit has expressly stated (as PPG suggests) that these three facts are indispensable elements of *all* § 2 claims arising from a refusal to deal. Nonetheless, because Plaintiff's claims here are analogous to *Aspen Skiing* on all three grounds, the Court need not resolve this definitively.

Drawing all inferences in Plaintiff's favor, the Court concludes that this case plausibly fits within the *Aspen Skiing* exception. First, PPG terminated a prior profitable course of dealing with Plaintiff. Plaintiff has been a reseller of aerospace sealant since 1976 and has repackaged PPG's aerospace sealant for resale since at least 2001. PPG knew that Plaintiff repackaged its sealant, yet besides making periodic comments to Plaintiff's customers that Plaintiff was not supposed to do so, PPG took no real steps to prevent Plaintiff from repackaging.[6] This tacit acceptance of Plaintiff's repackaging is in principle no different from the joint venture at issue in *Aspen Skiing*; in both cases, the parties knowingly and voluntarily participated in a (presumably profitable) course of dealing with each other for years. *See Trinko*, 540 U.S. at 409, 124 S.Ct. 872 (a voluntary course of dealing is "presumably profitable" for its participants); *Aspen Skiing*, 472 U.S. at 604 n.31, 105 S.Ct. 2847 (" 'In any business, patterns of distribution develop over time; these may reasonably be thought to be more efficient than alternative patterns of distribution that do not develop.' " (citations omitted)). And like *Aspen Skiing*, PPG's abrupt decision to end this course of dealing suggests that it was willing to sacrifice short-term profits for the possibility of charging inefficient monopoly prices in the long run.

Second, PPG is apparently refusing to sell to Plaintiff at even retail value sealant that can be repackaged for resale. That is, PPG is willing to sell sealant to end-users at a particular price but will not sell the same sealant to resellers at the same price—or at *any* price. While PPG no doubt believes that these are two distinct products (i.e., sealant vs. sealant that can be repackaged for resale), Plaintiff makes a plausible case that the supposedly unique risks associated with external repackaging—which PPG uses to justify its refusal to sell the latter—do not actually exist. For instance, Plaintiff alleges that PPG's ASCs follow the exact same repackaging procedure that they did before PPG acquired them, thus showing that there is nothing uniquely safe about PPG's internal repackaging procedures. Indeed, PPG tolerated repackaging by Plaintiff and others for at least 15 years before August 2016, allegedly without incident.[7] These facts are sufficient at the pleading stage to show that there is no real distinction between repackageable and non-repackageable sealant. And once that distinction is removed from the equation, all that is left is PPG's bare refusal to sell sealant—even at retail price—to Plaintiff. Such conduct, if true, "reveal[s] a distinctly anticompetitive bent." *Trinko*, 540 U.S. at 409, 124 S.Ct. 872.

Finally, like *Aspen Skiing*, PPG sells wholesale quantities of sealant to non-repackaging resellers and other bulk-purchasers of sealant. PPG also voluntarily sold sealant to repackagers on the same terms as it did non-repackagers for years. Thus, the Court will not have to develop from scratch the terms and conditions on which PPG must sell sealant to Plaintiff in order to remedy the refusal to deal; it

---

6. Although PPG suggests that the comments it made to Plaintiff's customers is evidence that it always prohibited repackaging, this is not the only inference that can be drawn from such evidence. Indeed, Plaintiff directly alleges that PPG had no policy against repackaging before August 2016.

7. Although Plaintiff does not point to it, the Court finds that PPG's refusal to discuss with Plaintiff either the problems purportedly caused by external repackaging or what steps could be taken to avoid such problems also adds to the inference that PPG had an anticompetitive motive in implementing its anti-repackaging policy.

simply needs to order PPG to deal with Plaintiff on the same terms as it does non-repackagers. *Trinko*, 540 U.S. at 410, 124 S.Ct. 872.

For these reasons, Plaintiff's monopolization and attempted monopolization claims survive—for now.

## B. Tying

PPG argues that Plaintiff does not satisfy any of the elements of a tying claim under either the Sherman Act or California's Cartwright Act.

■ "A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market." *Cascade Health*, 515 F.3d at 912. "To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product). Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product." *Id.* (citations and footnotes omitted).

■ "Both Section 1 [of the Sherman Act] and the Cartwright Act prohibit illegal tying arrangements," and the elements of a § 1 tying claim for the most part mirror that of the Cartwright Act. *Real-Page, Inc. v. Yardi Sys., Inc.*, 852 F.Supp.2d 1215, 1222 (C.D. Cal. 2012). " 'For a tying claim to suffer per se condemnation, a plaintiff must prove: (1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the

tied product; and (3) that the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market.' " *Rick–Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 971 (9th Cir. 2008) (quoting *Cascade Health*, 515 F.3d at 913).[8]

### 1. Defining the Tied Product Market

■ Plaintiff alleges that the tying product is "[a]erospace sealant[ ]" and that the tied product is "end-user packaging." (Compl. ¶¶ 64, 65.) PPG argues that Plaintiff's tying claim must be dismissed because it has not defined the product market for "end-user packaging." PPG also argues that sealant, being a liquid or paste, must always be sold in *some* sort of container or packaging, and thus sealant and "end-user packaging" do not qualify as distinct products. In its Opposition, Plaintiff appears to narrow the tied product to injection kits (rather than *all* sealant packaging intended for purchase or use by the end-user), and argues that the historical practice of external repackaging shows that injection kits and sealant are indeed distinct products.

■ An antitrust complaint must define the relevant market for both the tying product and the tied product. *Sidibe v. Sutter Health*, 4 F.Supp.3d 1160, 1176 (N.D. Cal. 2013) (tied and tying product); *In re Webkinz Antitrust Litig.*, 695 F.Supp.2d 987, 993 (N.D. Cal. 2010) (tied product); *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) (tying product). "The definition of an antitrust 'relevant market' is typically a factual rather than a legal inquiry, but certain legal principles govern the definition." *Apple, Inc. v. Psystar Corp.*, 586

---

**8.** Plaintiff does not rely on a rule-of-reason analysis for its tying claim. *See generally Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1157 (9th Cir. 2001) ("Tying can be either a *per se* violation or a violation under the rule of reason.").

F.Supp.2d 1190, 1196 (N.D. Cal. 2008) (citing *Newcal Indus.*, 513 F.3d at 1045). A product market comprises "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 406, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."). Pursuant to these guidelines, "the relevant market must include 'the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business.'" *Newcal Indus.*, 513 F.3d at 1045 (quoting *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989)). Accordingly, a complaint should be dismissed under Rule 12(b)(6) only where "the complaint's 'relevant market' definition is facially unsustainable." *Newcal Indus.*, 513 F.3d at 1045. Such a "facially unsustainable" relevant market definition may include cases where "the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Colonial Med. Group, Inc. v. Catholic Healthcare W.*, No. C-09-2192 MMC, 2010 WL 2108123, at *3 (N.D. Cal. May 25, 2010) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).

The Court agrees with PPG that Plaintiff has failed to adequately define the tied product market. While Plaintiff identifies the tied product as "end-user packaging," it is unclear what products this might encompass. The only type of "end-user packaging" that Plaintiff identifies (in either its complaint or its opposition to this motion) is injection kits, but it is not clear if this is simply one example of "end-user packaging" or if injection kits constitute the entire universe of "end-user packaging." As PPG points out, common sense would suggest that end-users can obtain sealants in other types of packaging—indeed, the sealant must arrive at the end-user's doorstep in *some* type of container if not injection kits. These ambiguities make Plaintiff's market definition unsustainable on its face, and thus dismissal with leave to amend is appropriate.

## 2. Coercion

PPG initially argues that PPG did not coerce resellers to purchase "end-user packaging" along with the sealant because PPG must sell sealant to end-users in some sort of packaging. In opposition, Plaintiff appears to limit the tied product to injection kits only, and argues that PPG's anti-repackaging policy forces resellers to purchase sealant and injection kits together when previously they did not have to. PPG responds that Plaintiff cannot allege a tie between sealant and injection kits either, because Plaintiff admits that it can still purchase the two separately despite PPG's policy. Assuming (without deciding) that the tied product is limited to injection kits and that such kits constitute a distinct product market for antitrust purposes, *see supra*, the Court agrees with Plaintiff.

There are two aspects to the coercion element. First, the seller must have market power in the tying product. *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46, 126 S.Ct. 1281, 164 L.Ed.2d 26

(2006); *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 17, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). Without such power, the seller has no leverage to force buyers to purchase the tied product from it at a (potentially) supracompetitive price; the buyer will simply purchase the tying product from another seller, leaving him or her free to shop around for a competitive price for the tied product. *See U.S. Steel Corp. v. Fortner Enters., Inc.*, 429 U.S. 610, 620, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977); *Jefferson Par.*, 466 U.S. at 17, 104 S.Ct. 1551. But when "the seller's share of the market is high, or when the seller offers a unique product that competitors are not able to offer, ... the likelihood that market power exists and is being used to restrain competition in [the tied product] market is sufficient to make per se condemnation [of the tie] appropriate." *Jefferson Par.*, 466 U.S. at 17, 104 S.Ct. 1551.

■ Second, the plaintiff must show that "the defendant went beyond persuasion and coerced or forced its customer to buy the tied product in order to obtain the tying product." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003). While an express refusal to sell the tying product without the tied product obviously constitutes coercion, *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1426 (9th Cir. 1995); *see also N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 7, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) (contractual obligation to purchase tied product is coercive), "tying conditions need not be spelled out in express contractual terms to fall within the Sherman Act's prohibitions," *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1179 (9th Cir. 2016). "A showing of an onerous effect on an appreciable number of buyers coupled with a demonstration of sufficient economic power in the tying market is sufficient to demonstrate coercion." *Moore v.*

*James H. Matthews & Co.*, 550 F.2d 1207, 1217 (9th Cir. 1977); *see also Cascade Health*, 515 F.3d at 914 (refusing to give a buyer a substantial discount on the tying product unless they buy the tied product can be coercive). "When a defendant adopts a policy that makes it unreasonably difficult or costly to buy the tying product (over which the defendant has market power) without buying the tied product from the defendant, it 'forces' buyers to buy the tied product from the defendant and not from competitors." *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 272 (6th Cir. 2015), *cert. dismissed*, —— U.S. ——, 136 S.Ct. 498, 193 L.Ed.2d 362 (2015).

■ There is no dispute that PPG possesses immense—indeed, monopolistic—power in the tying product market. PPG produces over 90% of aerospace sealant manufactured in the United States, and thus has significant leverage over its customers to dictate the terms on which they must purchase sealant. Moreover, the facts in the complaint plausibly show that PPG's anti-repackaging policy coerces resellers to purchase injection kits with the sealant. Resellers flourish in the retail distribution market in large part because they satisfy the end-user's need for pre-filled injection kits. Due to PPG's anti-repackaging policy, however, the only way for resellers to continue supplying end-users with injection kits pre-filled with PPG sealant is to buy the kits pre-filled from PPG itself—which obviously entails purchasing both the sealant and the kit from PPG. While PPG theoretically continues to sell sealant and kits separately to resellers, its anti-repackaging policy makes those separately-purchased kits useless. This is sufficient to demonstrate coercion at the pleading stage.

### 3. Harm to Competition

 PPG argues that Plaintiff has failed to allege harm to competition in the tied product market specifically. Plaintiff responds that it has generally alleged harm to competition in the retail distribution market for aerospace sealant, and suggests that this is enough to state a tying claim. Plaintiff is incorrect.

 "The injury caused by an unlawful tying arrangement is 'reduced competition in the market for the tied product.'" *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1089 (9th Cir. 2009) (quoting *Rick–Mik Enters.*, 532 F.3d at 971). "Thus, the inquiry is 'whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis*, is foreclosed to competitors by the tie.'" *Id.* (quoting *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969)). "[A] plaintiff must allege and ultimately prove facts showing a significant negative impact on competition in the tied product market." *Sidibe*, 4 F.Supp.3d at 1179 (internal quotation marks omitted).[9]

Here, Plaintiff does not point to any allegations in its complaint demonstrating harm to competition in the purchase or sale of injection kits specifically. Plaintiff instead discusses at length the general harm to competition in the retail distribution market based on the substantial reduction in the number of companies able to offer competitively-priced pre-filled injection kits to end-users. To the extent that there is a plausible link between reduced competition in the retail distribution market and reduced competition in the injection kit market, Plaintiff fails to spell it out in either its complaint or its opposition. The Court therefore dismisses the tying claims under § 2 and Section 16720 with leave to amend to cure this defect.

### C. Secret Unearned Discounts

In addition to its monopoly and tying claims, Plaintiff alleges that PPG gave secret discounts to its customers that were not offered to Plaintiff. Plaintiff alleges that PPG maintains a public list price for all of its products, and that all "regular customers" (including Plaintiff) currently receive a 5% discount from the list price. (Compl. ¶ 87.) PPG publicly stated that it does not otherwise price discriminate among its customers, but according to Plaintiff, PPG secretly provided much bigger discounts to other customers that "did not present a competitive threat to PPG." (*Id.* ¶¶ 87, 89, 93.) Plaintiff gives three examples of discounts provided to other customers that were far in excess of the 5% "regular customer" discount available to Plaintiff. (*Id.* ¶¶ 90–92.) These discounts harmed Plaintiff by (1) enabling resellers who received the discounts to "underbid Plaintiff for sales," and (2) enabling PPG to lure away Plaintiff's customers by selling products to them at a lower price than what PPG would even sell to Plaintiff (let alone the price Plaintiff could *resell* them at). (*Id.* ¶ 94.) PPG's purpose in giving these discounts was to "undermin[e] competitive discipline in the market for the

---

9. Plaintiff need not establish such harm for its claim under California Business & Professions Code section 16727 as long as it can establish that PPG had the requisite market power in the tying market. *Morrison v. Viacom, Inc.*, 66 Cal.App.4th 534, 542, 78 Cal. Rptr.2d 133 (1998); *Classen v. Weller*, 145 Cal.App.3d 27, 37, 192 Cal.Rptr. 914 (1983). However, Plaintiff does need to establish such harm for both its Sherman Act claim and its claim under Section 16720. *Morrison*, 66 Cal. App.4th at 542, 78 Cal.Rptr.2d 133; *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App.4th 1224, 1234, 60 Cal.Rptr.3d 631 (2007).

distribution of aerospace sealants." (*Id.* ¶ 95.)

PPG argues that Plaintiff has not established any element of a claim for secret unearned discounts. California's Unfair Practices Act proscribes "[t]he secret payment or allowance of . . . unearned discounts, whether in the form of money or otherwise, . . . to the injury of a competitor and where such payment or allowance tends to destroy competition." Cal. Bus. & Prof. Code § 17045. "Thus, as relevant to this case, there are three elements to a violation of section 17045. First, there must be a 'secret' allowance of an 'unearned' discount. Second, there must be 'injury' to a competitor. Third, the allowance must tend to destroy competition." *Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*, 16 Cal.App.4th 202, 212, 20 Cal.Rptr.2d 62 (1993). Section 17045 must be "liberally construed" in order to "foster and encourage competition[ ] by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices." *Id.* (citing Cal. Bus. & Prof. Code §§ 17001–02).

### 1. Tending to Destroy Competition

▮▮ PPG first argues that Plaintiff has not alleged any injury to competition—e.g., "that resellers have been forced to exit the market or that prices have increased"—and thus does not satisfy this element. (Mot. at 17.) The Court disagrees. Plaintiff need not allege that PPG's secret discounts have *already* destroyed competition; Plaintiff need only show that the discounts "tend[ ]" to destroy competition. *See Diesel Elec.*, 16 Cal. App.4th at 213, 20 Cal.Rptr.2d 62. Indeed, "where one competitor is given a major pricing advantage over another competitor, such pricing discrimination has an inherent tendency to destroy competition." *Id.* at 213–14, 20 Cal.Rptr.2d 62; *see W. Pac. Kraft, Inc. v. Duro Bag Mfg. Co.*, 794 F.Supp.2d 1087, 1091 (C.D. Cal. 2011) (allegation that competitor enjoyed a "major pricing advantage" is sufficient to show harm to competition); *First Class Vending, Inc. v. Hershey Co.*, No. CV1501188MWFFFMX, 2015 WL 12426155, at *6 (C.D. Cal. July 28, 2015) (same).[10] Here, Plaintiff alleges that it was PPG's biggest competitor in the retail distribution market. Offering discounts to Plaintiff's competitors and customers not offered to Plaintiff has a tendency to substantially reduce Plaintiff's customer base. Over the long run, this will put Plaintiff out of business. And once PPG loses its biggest competitor in the retail distribution market, PPG will be free (or at least more free than it is now) to charge supracompetitive prices for sealant to end-users. Plaintiff has therefore demonstrated that PPG's price discrimination has a tendency to harm competition.

### 2. Injury to a Competitor

▮▮ PPG next argues that Plaintiff has not adequately alleged that it suffered any injury as a result of the discounts. The Court again disagrees. To satisfy this element, the plaintiff "must allege a loss that flows from an anticompetitive aspect or effect of the defendant's behavior." *Church & Dwight Co. v. Mayer Labs., Inc.*, No. C-10-4429 EMC, 2011 WL 1225912, at *17 (N.D. Cal. Apr. 1, 2011) (internal quotation marks omitted); *see also W. Pac. Kraft*, 794 F.Supp.2d at 1091 (injury sufficiently alleged where complaint stated that "as a result of the [secret] rebates[,] virtually all of Plaintiff WPK's major customers began

10. Although the discounts in *Diesel Electric, Western Pacific Kraft,* and *First Class Vending* had also already destroyed competition, those cases nonetheless make clear that the discriminatory pricing alone was sufficient to satisfy this element.

buying paper products directly from Defendant Duro," that the plaintiff "tried, and failed, to obtain an alternate source of supply" for its products, and that the plaintiff "was effectively run out of business as a result of Defendant Duro's discriminatory pricing"). Here, PPG's discounts allowed Plaintiff's competitors to lure away its customers by offering them lower prices than Plaintiff could afford to offer, and also caused Plaintiff's customers to purchase products directly from PPG instead of Plaintiff. (Compl. ¶ 94.) Contrary to PPG's arguments, this is not simply a formulaic recitation of the element for this claim; it outlines specifically how the discounts financially hurt Plaintiff. This is sufficient for pleading purposes.

### 3. Examples of Discounts

Finally, PPG attacks on various grounds the three examples of secret discounts alleged in the complaint.[11]

#### i. Exhibit C

PPG argues that this exhibit reflects an out-of-state transaction (i.e., a sale from a California seller to an Arizona buyer that was shipped to Arkansas), and thus California law does not apply to it. The Court finds PPG's argument on this issue insufficiently developed and thus waived. Whether California law, Arizona law, or Arkansas law applies to this transaction requires the application of a detailed three-prong government-interest test. *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 590 (9th Cir. 2012); *McCann v. Foster Wheeler LLC*, 48 Cal.4th 68, 88, 105 Cal.Rptr.3d 378, 225 P.3d 516 (2010). Rather than undertake this analysis, however, PPG sim-

ply states that "California law does not apply to [this] transaction[ ]," and cites one district court case for support. (Mot. at 19.) This is not enough to preserve the argument. *See, e.g., Acosta–Huerta v. Estelle*, 7 F.3d 139, 144 (9th Cir. 1992); *United States v. Ramirez*, 448 Fed.Appx. 727, 729 (9th Cir. 2011).

#### ii. Exhibit D

■ PPG argues that this exhibit reflects a transaction between PPG and a wholly-owned subsidiary, and contends that liability does not attach under Section 17045 in such circumstances pursuant to *Eddins v. Redstone*, 134 Cal.App.4th 290, 341–43, 35 Cal.Rptr.3d 863 (2005). In response, Plaintiff concedes that *Eddins* bars Section 17045 liability for transactions between commonly controlled companies, but argues that the Court should not follow *Eddins* because it was wrongly decided. The Court declines Plaintiff's invitation. On questions of state law, "where there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts." *Teleflex Med. Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 851 F.3d 976, 982 (9th Cir. 2017). Plaintiff vaguely argues that *Eddins* should not have relied on case law interpreting the Robinson–Patman Act to decide the issue because "federal antitrust laws ... do[ ] not operate the [same] way" as the Unfair Practices Act. This, without more, is not "convincing evidence" that the California Supreme Court would adopt a different rule. There are numerous cases

---

11. The Court rejects PPG's argument that none of these discounts are "secret" because Plaintiff eventually discovered them and filed this lawsuit. (Mot. at 18.) Reading Section 17045 in this manner would effectively preclude any claim for secret unearned discounts. *See W. Pac. Kraft*, 794 F.Supp.2d at

1090 (secrecy requirement not met only where both the customer *and* the public knew of the "essential terms" of the discounts); *Diesel Elec.*, 16 Cal.App.4th at 212, 20 Cal. Rptr.2d 62 (section 17045 must be liberally construed).

holding that the policies underlying both Acts are similar, and thus the cases and principles arising under one often are persuasive on similar issues affecting the other. *See, e.g., G.H.I.I. v. MTS, Inc.,* 147 Cal.App.3d 256, 271, 195 Cal.Rptr. 211 (1983) (citing *Uneedus v. Cal. Shoppers, Inc.,* 86 Cal.App.3d 932, 938, 150 Cal.Rptr. 596 (1978)); *Diesel Elec.,* 16 Cal.App.4th at 212, 20 Cal.Rptr.2d 62. While there are also cases that recognize some wording differences between the two Acts, *e.g., Bay Guardian Co. v. New Times Media LLC,* 187 Cal.App.4th 438, 455, 114 Cal.Rptr.3d 392 (2010), Plaintiff does not explain how those differences make *Eddins*'s conclusion untenable. Accordingly, the Court rejects Plaintiff's argument.

Alternatively, Plaintiff argues that Exhibit D supports the inference that this was a sale made to an external company rather than a PPG subsidiary, in which case *Eddins* would not apply. The Court disagrees with this argument as well. Exhibit D identifies a PPG ASC in Los Angeles as the supplier, a PPG ASC in Canada as the "bill to" entity, and a company called Rio Bravo International as the "ship to" entity. (Compl., Ex. D.) Plaintiff does not appear to dispute that the "bill to" entity is indeed a subsidiary of the "supplier" entity (or at least that they share a common controlling parent), and the Court cannot plausibly infer anything other than that the "bill to" entity reflects the purchaser and the "supplier" entity reflects the seller. Thus, the Court cannot reasonably infer that the price listed on the invoice reflects anything other than the price that the "bill to" entity paid for the product. Consequently, Exhibit D does not show that PPG offered Rio Bravo a discount at all.

The Court therefore dismisses this claim without leave to amend to the extent it is based on this transaction.

### iii. Exhibit E

Finally, PPG argues that Exhibit E reflects a transaction with PPG, not another purchaser, and thus does not show that PPG gave out any secret unearned discounts. Exhibit E is an invoice showing that Plaintiff purchased a product from PPG at a per-unit cost of $92.19. However, the invoice also includes the following notation from PPG: "Special IC Pricing $42.58 per Michelle & Mary for Aero Hardware." (Compl., Ex. E.) Plaintiff argues that this notation shows that Aero Hardware received the same product from PPG at a per-unit cost of $42.58—less than half what Plaintiff paid for it. (Compl. ¶ 92.) The Court agrees with Plaintiff that this is a plausible inference. At the very least, the fact that the notation expressly states that Aero Hardware is receiving "special pricing" from "Michelle & Mary" supports the notion that PPG is giving discounts to certain customers that are not (or at least are not intended to be) public knowledge.

### D. Intentional Interference with Prospective Economic Advantage

PPG argues that Plaintiff fails to adequately allege several elements of its claim for interference with prospective economic advantage.

 "The elements of the tort of intentional interference with prospective economic advantage are: (1) an economic relationship between the plaintiff and some third person containing the probability of future economic benefit to the plaintiff; (2) knowledge by the defendant of the existence of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to the plaintiff proximately caused by the acts of the defendant." *Blank v. Kirwan,* 39 Cal.3d 311, 330, 216 Cal.Rptr. 718,

703 P.2d 58 (1985). In addition, the plaintiff must show that the defendant's conduct was wrongful by some legal measure other than the fact of the interference itself. *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 393, 45 Cal. Rptr.2d 436, 902 P.2d 740 (1995).

### 1. Existence of an Economic Relationship

■■■■ PPG argues that Plaintiff has not satisfied this element because it has not identified any specific customer or economic relationship with which PPG interfered. Plaintiff counters that its general identification of its present and potential future end-user customers is sufficient. PPG is correct. "[I]t is essential that the Plaintiff allege facts showing that Defendant interfered with Plaintiff's relationship with a particular individual." *Damabeh v. 7–Eleven, Inc.*, No. 5:12-CV-1739-LHK, 2013 WL 1915867, at *10 (N.D. Cal. May 8, 2013) (citing *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal.App.4th 507, 527, 49 Cal.Rptr.2d 793 (1996)). "Allegations that a defendant interfered with the plaintiff's relationship with an 'as yet unidentified' customer will not suffice." *Id.*; *see also Satmodo, LLC v. Whenever Commc'ns, LLC*, No. 17-CV-0192-AJB NLS, 2017 WL 1365839, at *9 (S.D. Cal. Apr. 14, 2017) ("To establish the first element, plaintiff must allege the existence of a specific prospective relationship, not potential relationships with a class of unknown investors or purchasers." (citations and internal quotation marks omitted)); *Roth v. Rhodes*, 25 Cal.App.4th 530, 546, 30 Cal.Rptr.2d 706 (1994). Plaintiff must identify specific third parties with whom it had an economic relationship; a general averment that it "had relationships with its customers and prospective customers" is insufficient. (Compl. ¶ 80.) The Court therefore dismisses this claim with leave to amend.

### 2. Intent to Disrupt the Relationship

PPG argues that Plaintiff has not alleged specific facts from which one can infer that PPG intended to disrupt the relationship between Plaintiff and its customers and/or potential future customers. Plaintiff responds that it need only plead intent generally, *see* Fed. R. Civ. P. 9(b), and thus its general allegation that PPG intended to disrupt Plaintiff's economic relationships suffices.

■■■■ "[A] plaintiff may satisfy the intent requirement by pleading specific intent, i.e., that the defendant desired to interfere with the plaintiff's prospective economic advantage." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1154, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003). However, "a plaintiff may alternately plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action." *Id.* But either way, a plaintiff cannot allege intent merely by making a conclusory allegation to that effect. *Iqbal*, 556 U.S. at 686, 129 S.Ct. 1937. Rather, the Court must review the claim's "factual context" to determine whether the intent allegation is plausible. *Id.*

■■■■ The Court concludes that Plaintiff's allegations suffice to show intent. Plaintiff has alleged that PPG intended to monopolize the retail distribution market for aerospace sealant by imposing an anti-repackaging policy. The policy does this by preventing resellers (of which Plaintiff is one of the biggest) from offering sealant to end-users in their preferred packaging at a competitive price, thus encouraging them to buy sealant from PPG instead. PPG was certainly aware of Plaintiff's status as a repackaging reseller when it implemented its policy, and thus it is reasonable to infer that PPG knew to a substantial certainty

that the policy would decrease Plaintiff's customer base specifically. Contrary to PPG's argument, the fact that it offered to make custom packaging for Plaintiff to suit the needs of its customers does not conclusively show that PPG lacked such intent. PPG might have known, for example, that such an offer would still have forced Plaintiff to raise its resale prices and thus would have been an inadequate substitute for Plaintiff repackaging sealant itself. For these reasons, the Court declines to dismiss this claim on this basis.

### 3. Wrongful Conduct

PPG argues that Plaintiff has failed to establish that PPG's conduct was independently wrongful because it has not properly alleged that PPG violated any other laws. Because the Court concludes that at least Plaintiff's monopolization claims survive, the Court cannot dismiss this claim on this basis.

### E. Unfair Competition

PPG argues that Plaintiff has failed to state a claim for violation of the UCL because its alleged conduct violates neither antitrust laws nor the policy or spirit of those laws. *See Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 187, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). Again, because the Court has concluded that Plaintiff has stated a monopolization claim and an attempted monopolization claim, the Court rejects PPG's argument.

### V. CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** PPG's Motion. The Motion is granted with leave to amend unless otherwise noted. Plaintiff shall file an amended complaint within 21 days that cures these deficiencies. PPG's response to the amended complaint shall be due 21 days thereafter.

**IT IS SO ORDERED.**